## HERTZ COMMERCIAL LEASING CORPORATION *v.* DYNATRON, INC.

SUPERIOR COURT | JUDICIAL DISTRICT OF NEW HAVEN | FILE No. 111953

Memorandum filed September 16, 1980

*Charles A. Sherwood,* for the plaintiff.

*Ullman, Perlmutter & Sklaver,* for the defendant.

NORTON M. LEVINE, J. The plaintiff is a commercial leasing corporation, which engages in the financing of equipment obtained by customer-users from vendors.

It seeks a deficiency judgment against the defendant, following an alleged default by the defendant, under an equipment lease. It relies on the Uniform Commercial Code (hereinafter the UCC), as enacted in New York, to enforce its rights.

The defendant is a corporation in North Haven, Connecticut, which negotiated with an office equipment concern, known as A-Copy of Glastonbury, Connecticut, for the lease of a copy machine, described as a Minolta No. 101. The defendant's negotiations were conducted chiefly with George Papa, as a representative of A-Copy, Inc.

On or about August 31, 1975, the defendant executed a lease agreement for the Minolta. The lease agreement designated the defendant as lessee, and the plaintiff as lessor, or secured party, under the UCC. A-Copy, Inc. was listed in the lease form as the "Vendor." The quoted sale price of the machine was $2320. The lease was for a sixty-month term, at a monthly rental of $62, making a total lease rental of $3720. The lease was on a form prepared and printed by the plaintiff. Paragraph 10 thereof provides that the lease shall constitute a "Security Agreement," under the UCC.

The defendant made no payments on account of the lease. It claimed that almost immediately following delivery of the machine, it developed operational problems, and that its reproduction qualities were defective.

The defendant commenced writing letters of protest to the plaintiff and A-Copy, relative to the defects, commencing in the early months of 1976. It requested that the plaintiff repossess said machine. In or about February, 1976, the defendant finally purchased a Xerox machine, and did not use the Minolta thereafter.

After a lapse of almost one year, the plaintiff picked up the Minolta machine, on or about February 14, 1977. It transported the machine, to one of its warehouses in New York. Thereafter, its Connecticut counsel wrote a letter to the defendant, under date of August 15, 1977, stating that on August 24, 1977, at 10 a.m., the machine would be sold on the plaintiff's warehouse premises in Manhattan. The letter was allegedly sent, pursuant to General Statutes § 42a-9-504, as recited therein.

The evidence disclosed that no actual sale of the machine was conducted on August 24, 1977. Instead, and in or about May, 1978, after obtaining about six competitive bids, the plaintiff proceeded to sell the machine, for $500, to a purchaser in the New York area.

The plaintiff's amended complaint, dated August 6, 1980, demands $3380.40, as the amount of a claimed deficiency judgment, under the UCC.

The defendant filed four special defenses. The first special defense asserts that the plaintiff's repossession, and subsequent resale, violated article 9 of the UCC; New York Uniform Commercial Code § 9-504 (McKinney); in that the plaintiff failed to give proper notice of the resale and improperly purchased the collateral at a private sale; and that the circumstances of the sale were not "commercially reasonable." New York Uniform Commercial Code § 9-504 (3) (McKinney). The defendant therefore argues that the plaintiff is not entitled to a deficiency judgment.

The second special defense alleges that on or about February 26, 1976, the defendant revoked its acceptance of the copy machine because of alleged defects therein, and that the defendant is under no liability because of its rejection.

The third special defense claims that the plaintiff's agents and employees, prior to the lease, made cer-

tain representations as to the efficiency and performance of the machine; that such representations were breached; that the machine never performed as represented; and hence that the value of the machine was "greatly reduced" because of the plaintiff's breach of these representations.

The fourth special defense attacks the lease as, "unconscionable, and therefore unenforceable." In this connection, the defendant relies heavily on § 2-302 of the UCC. It appears that the language of both the New York and Connecticut statutes on this issue is substantially or entirely the same.

The plaintiff cannot recover because of the merits of the first and fourth special defenses.

Although most of the operative facts pertaining to the execution of the lease and the delivery and operation of the machine occurred in Connecticut, the lease itself, in paragraph 17, provides that it shall be governed by and interpreted according to New York law.

It is settled that parties to a contract may expressly make the choice of law by which it is to be governed. *Pollak* v. *Danbury Mfg. Co.,* 103 Conn. 553, 557, 131 A.2d 426 (1925). This is further supported by the conflict of laws rule set forth in General Statutes § 42a-1-105 (1), since a number of important events herein took place within the state of New York.

In any event the conclusion of the court herein is the same whether New York or Connecticut law, or both, is applicable.

The requirements for a sale of collateral by the secured party appear in § 9-504 (3) of the UCC. This section is contained in New York Uniform Commercial Code § 9-504 (McKinney) which reads, in part, as follows: "§ 9-504. Secured Party's Right to Dispose of Collateral After Default; Effect of Disposition. (1) A

secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. Any sale of goods is subject to the Article on Sales (Article 2). The proceeds of disposition shall be applied, in the order following, to (a) the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorneys' fees and legal expenses incurred by the secured party; (b) the satisfaction of indebtedness secured by the security interest under which the disposition is made; . . . (2) If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency. . . . (3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be . . . at any time and place and on any terms but *every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.* Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale." (Emphasis added.)

The defendant's first special defense asserts noncompliance with § 9-504 (3), in several ways.

The defendant first urges that the plaintiff's letter to the defendant, relative to the alleged sale in

August, 1977, gave improper notice of the sale of collateral. Section 9-504 provides for two types of sale: a public sale and a private sale. The plaintiff previously claimed that the "sale" in 1977 was not a public sale.

For a private sale under § 9-504, the plaintiff must merely give the defendant notice of the time *after* which any private sale is to be made. The 1977 notice sent by the plaintiff to the defendant does not refer specifically either to a public or private sale. The notice, itself, however, met all the requirements of a public sale notice. Hence, the 1977 notice is ambiguous, misleading and confusing, since it was not made clear therein to the defendant whether the plaintiff intended a public or a private sale.

The plaintiff's position is again weakened because no actual sale of the machine occurred on August 24, 1977.

The plaintiff argued that following its repossession it "bought in" the machine on a "sale" on August 24, 1977. The plaintiff submits that it "assumed" the machine on August 24, 1977. The court disagrees with this somewhat ambiguous contention. The blunt fact is that the machine, as seen previously, was sold by the plaintiff to a buyer for $500, in May, 1978 – about nine months after the date specified in the original notice of sale. So far as the record discloses, the defendant never received a notice of the 1978 sale.

In the opinion of the court, whether the sale in May, 1978, be termed a public or a private sale, the plaintiff's failure to notify the defendant relative thereto is a crucial noncompliance with the mandate of § 9-504.

The plaintiff attempts to invoke § 9-504 (3) which states, in part, that if the collateral is of a type customarily sold in a recognized market, or is the type which is the subject of widely distributed price quota-

tions, the plaintiff may buy it at a private sale. This provision is irrelevant. It would seem that the only items logically included in this category would be widely traded stocks or bonds.

Section 9-504 (3) states, in part, that: ". . . every aspect of the disposition, including the method, manner, time, place and terms, must be commercially reasonable." The defendant has urged that the plaintiff's disposition or sale was not "commercially reasonable." This argument has merit.

The court has previously concluded that no actual sale took place until the plaintiff's sale to a private buyer in May, 1978, for $500. This was some fifteen months following the repossession by the plaintiff. The substantial lapse of time obviously persuaded the 1978 buyer to make a reduced offer because of the increased age of the machine, the additional depreciation thereof for many months, and other related factors which would influence a buyer to lower his bid. Unreasonable delay in the sale may produce a violation of § 9-504. *Nelson* v. *Armstrong,* 99 Idaho 422, 431, 582 P.2d 1100 (1978).

The sale by the plaintiff thus was not commercially reasonable, in view of the method, manner and time thereof. *Banker's Trust Co.* v. *Steenburn,* 95 Misc. 2d 967, 983, 409 N.Y.S.2d 51 (1978).

The phrase "commercially reasonable," in terms of § 9-504 (3), means that the qualifying disposition of the collateral must be made in a good faith attempt to accomplish disposition to the parties' *mutual* best advantage. *Central Budget Corporation* v. *Garrett,* 48 App. Div. 2d 825, 368 N.Y.S.2d 268 (1975).

As a commentary on the plaintiff's alleged "purchase" in August, 1977, any private sale of collateral in which only one bid is received or solicited is highly

questionable.  It should be closely scrutinized.  *Hall* v. *Owen County State Bank,* 370 N.E.2d 918, 930 (Ind. App. 1977).

The plaintiff had the burden of proving that its "sale" (whether in 1977 or 1978) was "commercially reasonable."  It failed to sustain its burden.  White & Summers, Uniform Commercial Code (1972), p. 994.

The defendant next argues that the plaintiff is not entitled to a deficiency judgment where the method of its sale of collateral violated § 9-504 (3).  The court agrees.

It must be stated that article 9 is not clear as to the effect of the plaintiff's noncompliance with § 9-504 and its impact on a claimed deficiency judgment. There is, however, persuasive case law supporting the proposition that a deficiency judgment cannot be recovered where the secured party did not comply with the statutory requirements for sale.

In *Associates Discount Corporation* v. *Cary,* 47 Misc. 2d 369, 371, 262 N.Y.S.2d 646 (1965), the court denied a deficiency, following a sale of collateral.  The court stated:  "It is the well established law of New York, the forum where the deficiency is sought, that if the repossession and resale are not in compliance with the law, no suit for any claimed deficiency will lie." Accord *Leasco Data Processing Equipment Corporation* v. *Atlas Shirt Co.,* 66 Misc. 2d 1089, 1090, 323 N.Y.S.2d 13, 17 (1973); *Banker's Trust Co.* v. *Steenburn,* supra, 982; *Braswell* v. *American National Bank,* 117 Ga. App. 699, 700, 161 S.E.2d 420 (1968).

A leading case is *Skeels* v. *Universal CIT Credit Corporation,* 222 F. Sup. 696 (D.C. W.D. Pa. 1963). In *Skeels,* the finance company did not give the defendant automobile dealer notice, as required by the Pennsylvania UCC, when the plaintiff sold automobiles removed from the dealer's establishment. The court held that the finance company could not recover from

the dealer for the losses sustained in selling the automobiles, and the related sale expenses. The court stated (p. 702) as follows: "It seems to this Court, however, that to permit a recovery by a security holder of a loss in disposing of collateral when no notice has been given, permits a continuation of the evil which the Commercial Code sought to correct . . . . In my view it must be held that a security holder who sells without notice may not look to the debtor for any loss."

The above cited cases are compelling reasons for holding that since the original sale notice to the defendant, and the method and procedures of the alleged 1977 sale, or the 1978 sale, were not in compliance with the controlling New York statutes, the plaintiff is not entitled to recover a deficiency judgment in any amount whatsoever. New York Uniform Commercial Code § 1-103 (McKinney). Compare *Savings Bank of New Britain* v. *Booze,* 34 Conn. Sup. 632, 636–37, 382 A.2d 226 (1977).

The defendant has made the claim of unconscionability of the lease pursuant to its fourth special defense. It relies on § 2-302 of the UCC. Section 2-302 (1) gives the court power to refuse to enforce the entire contract, or any clause of the contract, which was "unconscionable" at the time it was made.

The defendant stresses two cases: *Fairfield Lease Corporation* v. *Umberto,* 7 UCC Reporting Service 1181 (N.Y. Civil Court, 1970), and *Fairfield Lease Corporation* v. *Pratt,* 6 Conn. Cir. Ct. 537, 540–41, 278 A.2d 154 (1971).

In *Fairfield Lease Corporation* v. *Pratt,* the court, in ruling for the defendant on a vending machine lease agreement, relied heavily on *Umberto. Umberto* referred to numerous clauses in the lease agreement which made the entire lease unconscionable, and therefore unenforceable against the lessee. Reference

to the present lease reflects that it contains a great number of clauses the individual or cumulative effect of which is to impose harsh burdens on the defendant, as lessee, over and above fair and reasonable concepts of an equitable agreement between the parties relative to damages for any breach thereof.

Paragraph 5 of the lease requires the defendant to pay any and all taxes, assessments, fees or penalties assessed on the equipment. Paragraph 8 obligates the defendant, at its sole expense, to keep the equipment in good order, condition and repair, and to keep it fully insured, in the name of the plaintiff, at the defendant's expense.

Paragraph 11 is the crucial clause. It summarizes the damages recoverable upon the defendant's default in the payment of rent "or in the event of any other default or breach" of the lease. Paragraph 11 states that in any of said events, the plaintiff, following a written notice of termination, may repossess the equipment. In the event of such termination, the defendant is thereby obligated to pay the plaintiff, in addition to any arrears of rentals, the expenses of retaking possession and removing the equipment, court costs, and up to 20 percent attorney's fees, and, in addition, a sum equal to the entire balance of the rent stipulated in the lease.

Paragraph 11 refers to the stated items of recoverable damages by the plaintiff as "liquidated damages and not as a penalty." It is abundantly clear, however, that, on the basis of paragraph 11, the most minor and insignificant breach of the lease by the defendant permits the plaintiff, at its option, to recover damages far in excess of the fair value of such a minor (or even moderate) breach.

As noted in *Fairfield Lease Corporation* v. *Pratt,* supra, 540, the cumulative effect of such enforcement clauses is harsh and penal, subjecting the lessee-

defendant to a forfeiture. Likewise, in *Umberto,* supra, the court stated (p. 1184): "Such a lease agreement is rooted in forfeiture; it inflicts a penalty; a contract is terminated not by performance but by breach resulting in a punishing finality – the victim, the lessee. . . . Hence, it is unenforceable . . . and plaintiff may not recover thereon."

See also White & Summers, Uniform Commercial Code, p. 125, and the recent case of *McNamara* v. *Murphy,* 36 Conn. Sup. 183, 192, 416 A.2d 170 (1980). The allegation in paragraph 11 that the damages now asserted by the plaintiff are merely "liquidated damages," and not a penalty, is not persuasive or binding on this court.

As a preliminary matter, there is a presumption of validity which attaches to a liquidated damage clause. This presumption, however, is rebuttable. The defendant, in spite of its default, may prove that the lease was the product of fraud, mistake or unconscionability under § 2-302 of the UCC. *Hamm* v. *Taylor,* 180 Conn. 491, 494–95, 429 A.2d 946 (1980). The UCC itself provides that a contract clause "fixing unreasonably large liquidated damages is void, as a penalty." New York Uniform Commercial Code § 2-718 (1) (McKinney). To the same effect, General Statutes § 42a-2-718 (1).

The court may refuse to enforce a liquidated damage clause on the ground that the plaintiff sustained no damages whatsoever from the particular breach of contract as a matter of law. *Norwalk Door Closer Co.* v. *Eagle Lock & Screw Co.,* 153 Conn. 681, 689, 220 A.2d 263 (1966).

The plaintiff had the burden of proof to demonstrate that the so-called liquidated damage clause was valid and could serve as a basis for recovery of damages. It failed to sustain its burden. *Vines* v. *Orchard Hills, Inc.,* 181 Conn. 501, 511, 435 A.2d 1022 (1980).

The first page of the lease states that "Hertz does not in any way warrant the merchantability of the leased property, or its fitness for any use to which it may be put by lessee."

This disclaimer is bolstered by a supplemental clause in paragraph 8 of the printed text of the lease.

The defendant urges that "since the lease attempts to disavow all warranties on the part of Plaintiff, such disclaimer is unconscionable, and should not be enforced." The defendant relies heavily on the case of *United States Leasing Corporation* v. *Franklin Plaza Apartments, Inc.,* 319 N.Y.S.2d 531 (N.Y. City Civil Court 1971).

It is not necessary to rule on this particular argument because of the court's prior decision on two of the special defenses herein.

The plaintiff has made allegations that its deficiency judgment may consist of three alternate figures, ranging from $1612.40 to $3110.40, plus counsel fees. Such claims lack substance, in any amount.

To summarize, the court finds that the sale, or purported sale, of the equipment by the plaintiff, was not commercially reasonable, under § 9-504 (3). It has further concluded that the statutory violations thereby debarred plaintiff from any claim for a deficiency judgment, under § 9-504 (2).

Finally, over and above the plaintiff's noncompliance with the said statutes, the court finds that the terms and conditions of the lease are unconscionable, pursuant to § 2-302 (1), and hence that the provisions thereof are not enforceable against the defendant, in any respect whatsoever.

Judgment may therefore enter for the defendant.